# OPERATING AGREEMENT

# OF

# SPICE TAPAS LLC


Doc ID: [illegible]a3c65065fad

TABLE OF CONTENTS

Article 1 DEFINITIONS....1

Article 2 FORMATION....1
**Section 2.1** Name....1
**Section 2.2** Scope of Business....1
**Section 2.3** Address; Principal Office and Principal Place of Business....1
**Section 2.4** Statutory Agent....2
**Section 2.5** Adoption of Articles....2
**Section 2.6** Term....2

Article 3 MEMBERS....2
**Section 3.1** Schedule of Members....2
**Section 3.2** Additional Members....2
**Section 3.3** Limitation on Rights and Duties of Members....2
**Section 3.4** Limited Liability....2

Article 4 MANAGERS....3
**Section 4.1** Exclusive Authority of Managers....3
**Section 4.2** Number, Tenure and Qualifications....3
**Section 4.3** Provisions Relating to Meetings....3
**Section 4.4** Actions Without a Meeting....3
**Section 4.5** Powers of the Managers....3
**Section 4.6** Acquisition and Disposition of Property....4
**Section 4.7** Duties of the Manager....4

Article 5 CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNTS AND LOANS....6
**Section 5.1** Initial Capital Contributions....6
**Section 5.2** Capital Accounts....6
**Section 5.3** Compliance with Section 704(b) of the Internal Revenue Code....6
**Section 5.4** Section 754 Election....7

Article 6 ALLOCATION OF PROFITS AND LOSSES AND DISTRIBUTIONS....7
**Section 6.1** Profits and Losses....7
**Section 6.2** Distributions....8
**Section 6.3** Limitations on Distributions....8

Article 7 BUSINESS OF MEMBERS....8

Article 8 INDEMNIFICATION ..... 9

Article 9 OWNERSHIP AND TRANSFER OF MEMBERSHIP INTERESTS ..... 9
- **Section 9.1** Restriction on Transfer ..... 9
- **Section 9.2** Voluntary Transfers ..... 9
- **Section 9.3** Withdrawal ..... 9
- **Section 9.4** Securities Law Restrictions on Transfer ..... 9
- **Section 9.5** Right of First Refusal. ..... 10
- **Section 9.6** Death of A Member. ..... 10

Article 10 ADMISSION OF NEW MEMBERS ..... 10
- **Section 10.1** Rights of Transferees ..... 10
- **Section 10.2** Admission of Substitute Members ..... 10
- **Section 10.3** Admission of Additional Members. ..... 10

Article 11 DISSOLUTION AND LIQUIDATION ..... 11
- **Section 11.1** Dissolution ..... 11
- **Section 11.2** Winding Up and Termination ..... 11
- **Section 11.3** Deficit Capital Accounts ..... 11
- **Section 11.4** Return of Contribution ..... 11

Article 12 AMENDMENTS ..... 12

Article 13 BUY/SELL ..... 12
- **Section 13.1** Buy/Sell ..... 12

Article 14 MISCELLANEOUS PROVISIONS ..... 13
- **Section 14.1** Notices ..... 13
- **Section 14.2** Severability ..... 14
- **Section 14.3** Successors and Assign ..... 14
- **Section 14.4** Title to Property ..... 14
- **Section 14.5** Waiver of Action for Partition ..... 14
- **Section 14.6** Governing Law ..... 14
- **Section 14.7** Statutory References ..... 14

**OPERATING AGREEMENT**
**OF**
**SPICE TAPAS LLC**

This Operating Agreement ("Agreement") of **SPICE TAPAS LLC**, a limited liability company organized pursuant to Chapter 57D of the North Carolina General Statutes, is made and entered into by 1221 Hospitality L.L.C., 3 Ventures, LLC, MJT Ventures LLC, and Akhenthians Investments LLC as Members ("Members").

## RECITALS

On 5th day of July, 2022, Nana Atakora organized a limited liability company known as **SPICE TAPAS LLC** ("Company") by filing Articles of Organization with the North Carolina Secretary of State ("Articles"). The Articles conform to the requirements of the Chapter 57D of the North Carolina General Statutes. The Members acquired their interest in the Company on April 5, 2023.

The Members have executed this Agreement in order to document all of their written and oral agreements with respect to the affairs of the Company and the conduct of its business. They intend that this Agreement, together with the Articles, shall be the complete documentation of those agreements.

## AGREEMENT

In consideration of their mutual acts, capital contributions and covenants, the Members agree as follows:

## ARTICLE 1
## DEFINITIONS

All capitalized terms appearing in this Agreement shall have the meanings assigned to them preceding their first use and/or the definitions assigned.

## ARTICLE 2
## FORMATION

**Section 2.1** Name. The Company shall conduct its business under the name **SPICE TAPSAS LLC** or any other name(s) determined by the Managers.

**Section 2.2** Scope of Business. The Company is formed to operate a restaurant, but may conduct any other business which a limited liability company may lawfully conduct either in the State of North Carolina or in any foreign jurisdiction, but only upon the vote of the Managers. The Company shall have the authority to do all things necessary to accomplish its purpose and operate its business as described in this Section.

**Section 2.3** Address; Principal Office and Principal Place of Business. The Company's initial principal place of business shall be 515 NORTH ELLIS LANE, SUITE 101



Case 3:26-cv-00471-MOC-DCK Document 17-1 Filed 09/21/26 Page 4 of 21
Doc ID: f39b22f95266f75f9a4fe3b47f99a2da3c65065fad

CHARLOTTE, NC 28202. The Managers, in their sole discretion, may move or amend the Company's principal place of business from time to time.

The Managers may agree to establish alternate or additional offices, provided they deliver written notice of each address to the Members.

**Section 2.4** Statutory Agent. The name and address of the Company's initial statutory agent is:

Nana Atakora
525 S Church St. #3705
Charlotte, NC 28202

**Section 2.5** Adoption of Articles. The Members adopt and ratify the Articles and agree that if there is a conflict between the terms of this Operating Agreement and the terms of the Articles, then the terms of the Articles shall prevail. The Company shall bear the costs and expenses associated with filing the Articles, preparing this Agreement and organizing the Company.

**Section 2.6** Term. The Company shall have a perpetual duration unless Members unanimously agree to terminate the Company.

## ARTICLE 3
## MEMBERS

**Section 3.1** Schedule of Members. The Managers shall maintain a Membership Schedule showing the full names (in alphabetical order), last known and business or mailing addresses, Initial Capital Contributions (including any contributed property) and Membership Interests of each Member of the Company. The Managers shall update this Schedule as necessary to reflect the admission, withdrawal or other activities of the Members from time to time.

**Section 3.2** Additional Members. Additional Members may be admitted to the Company upon the terms and conditions approved by all of the Members or as provided in Articles 9 and 10 of this Agreement. The admission of additional Members shall not cause the dissolution of the Company. No new Member shall be entitled to any retroactive allocation of profits, losses or distributions.

**Section 3.3** Limitation on Rights and Duties of Members. The Managers shall have exclusive authority to manage the business of the Company and no Member who is not also serving as a Manager shall have the right to participate in the management and control of the Company's business or the authority to: (a) transact any business on behalf of the Company; (b) execute or deliver any document in the Company's name; or (c) take any other action binding the Company in any way.

**Section 3.4** Limited Liability. No Member shall be personally liable for any loss, debt obligation or any other liability of the Company (including without limitation, any judgment,

decree, or order of any court) unless the Member independently accepts and consents to become bound by that liability.

**Section 3.5** Voting. Each Member shall be entitled to vote based on Membership Interest. If all or a portion of a Membership Interest is transferred to an assignee who does not become a Member, the Member from whom the Membership Interest is transferred shall no longer be entitled to vote the Units transferred nor shall the Units transferred be considered outstanding for any purpose pertaining to meetings or voting.

## ARTICLE 4
## MANAGERS

**Section 4.1** Exclusive Authority of Managers. The Managers shall have exclusive power and authority to manage and control all Company business, except in situations in which the approval of the Members is expressly required under this Agreement or by non-waivable provisions of applicable law. For this purpose, the Managers shall have all of the rights, powers and authority necessary to manage and control the business of the Company and/or to terminate the business of the Company, subject to the limitations imposed by law, the Articles or this Agreement. Third parties dealing with the Company shall be entitled to rely on the authority of the Managers to bind the Company for all purposes.

**Section 4.2** Number, Tenure and Qualifications. **Nana Atakora** and **Baffour Atakora** shall serve as the initial Managers. The initial Managers shall hold office for a term of ten (10) years, unless they die, resign or are removed from office by majority agreement of the Members. After any term, the Managers shall continue to hold office until Managers' successor(s) have been duly appointed and qualified. Subsequent to the expiration of the initial ten (10) year term, managers shall be elected by a unanimous vote of the Members for subsequent two (2) year terms.

**Section 4.3** Provisions Relating to Meetings. The Managers shall hold meetings as frequently as either deems necessary, but not less frequently than once each calendar year. If multiple Managers, any Manager may call a special meeting at any time on at least five (5) business days advance notice to the other Manager(s). Meetings shall be held at the principal office of the Company, if any, or at any other location at which the Managers determine. The Managers may agree to conduct meetings by means of telephone or other electronic communications equipment.

**Section 4.4** Actions Without a Meeting. Any action which may be taken at a meeting of the Managers may be taken without a meeting if the Managers sign a written consent describing the action they have taken.

**Section 4.5** Powers of the Managers. The exclusive authority delegated to the Managers specifically includes all of the foregoing express powers which are enumerated solely for the purpose of clarifying the broad nature of the authority granted to the Managers and are not intended to serve as a complete or comprehensive list of all of the powers granted by this Article.

**Section 4.6** Acquisition and Disposition of Property. The Managers may acquire and hold property in the name of the Company ("Property") and sell, lease, transfer or otherwise dispose of the Property on any terms determined unanimously by the Managers.

**4.6.1** Reasonable Expenditures. The Managers may pay out of Company funds all amounts necessary to cover reasonable Company expenditures, including without limitation, expenses of organizing the Company.

**4.6.2** Additional Capital Calls. The Managers, in their sole discretion, shall determine whether the Company requires additional funds to properly conduct its business. If so, then the Members shall unanimously determine whether the Company shall borrow the funds or whether the Members shall be requested to make Additional Capital Contributions.

**4.6.3** Employees and Other Personnel. The Managers shall have the right to employ clerical and administrative personnel ("Employees") and to retain consultants, managing, leasing and sales agents, accountants, attorneys and other professionals ("Consultants") on behalf of the Company. Except as otherwise provided in the Management Agreement, as defined herein, the Managers may delegate any of the duties assigned to them under this Agreement (other than the duty to vote and exercise reasoned and independent judgment) to these Employees and Consultants and the Managers may pay reasonable compensation to the Employees and Consultants from Company funds.

**4.6.4** Distributions. The Managers shall have exclusive authority to authorize distributions of Company funds as provided in Section 6.2 of this Agreement.

**Section 4.7** Duties of the Managers. The Managers shall perform or arrange for the performance of all of the duties reasonably necessary to conduct the business of the Company. The Managers shall assure that these duties are performed in good faith, in a manner they reasonably believe to be in or not to be opposed to the best interests of the Company, and with the care that an ordinary prudent person in a similar position would use under similar circumstances. The Managers shall not be expected to devote their entire time to Company affairs. The following specific duties are enumerated solely for the purpose of clarifying the broad nature of the responsibility delegated to the Managers and they are not intended to serve as a complete or comprehensive enumeration of all of the duties assigned by this Article.

**4.7.1** Accounting. The Managers shall select the Company's fiscal year and shall determine the appropriate accounting methods and procedures for complying with all requirements of all taxing authorities.

**4.7.2** Plan of Operation; Budget. Before the end of each fiscal year, the Managers shall designate a plan of operation ("Plan of Operation"), setting forth the projected business plans and operations for the period covered by

the Plan of Operation and a budget ("Budget") setting forth the estimated receipts and expenditures (capital, operating and other) of the Company for the period covered by the Budget. The Managers shall in good faith arrange for the implementation of the Plan of Operation and the Budget and is authorized to make the expenditures and incur the obligations provided for in the Budget. If or to the extent the Plan of Operation or Budget for any given year calls for Additional Capital Contributions or loans from the Members to the Company, then the Members shall make such Additional Capital Contributions and/or loans in the manner and on the terms set forth in the Plan of Operation and/or Budget.

**4.7.3** Books and Records. The Managers shall maintain the Company's books and records. The books and records shall contain true and full information regarding the status of the business and the financial condition of the Company, which shall include the following:

(a) the Membership Schedule;

(b) a current list of the full name, and last known business, mailing or residence address of each Manager;

(c) copies of the Articles and this Operating Agreement and all amendments to them;

(d) copies of the federal, state and local income tax returns of the Company;

(e) copies of the financial statements of the Company for the three most recent years;

(f) minutes of every meeting of the Managers and/or Members;

(g) copies of the current Plan of Operations and Budget for the Company; and

(h) any other information regarding the affairs of the Company that the Managers determine are reasonable.

The Managers shall make these books and records available for review by any Member for any purpose reasonably related to its Membership Interest, upon reasonable notice, during ordinary business hours, for inspection and copying at the expense of that Member.

**4.7.4** Tax Matters.

(a) The Managers shall make any tax elections for the Company allowed under the Internal Revenue Code or the tax laws of any


Doc ID: fa9b0229[illegible]66f75[illegible]a3c65065fad

state or other governmental entity having taxing jurisdiction over the Company.

(b) The Managers shall designate a business representative for the Company for tax matters. **Baffour Atakora** shall serve as the initial business representative for the Company.

**4.7.5** Collection and Disbursement of Funds. The Managers shall collect, deposit and disburse all Company funds. The Managers shall select all bank accounts, which shall be opened in the Company name, and designate the authorized signatory(s) on each Company account.

## ARTICLE 5
## CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNTS AND LOANS

**Section 5.1** Initial Capital Contributions. The Members acknowledge that they have made the Initial Capital Contributions shown in the Membership Schedule. No Member shall have the right to: (a) receive interest on any Capital Contribution; (b) withdraw any Capital Contribution without unanimous Member authorization; or (c) receive a guaranteed return of any portion of its Capital Contribution either in cash or in other property (and each Member expressly acknowledges that all returns of Capital Contributions, if any, shall be paid solely from assets of the Company).

**Section 5.2** Capital Accounts. The Company shall create a separate Capital Account for each Member, if it so elects, which shall be maintained in accordance with the capital accounting rules of Treasury Regulation Section 1.704-1(b)(2)(iv), and subsequent amendments, and this Section. The Managers may vary from the provisions of this Section to the limited extent they deem necessary or prudent in order to assure continued compliance with the Treasury Regulations.

**5.2.1** Each Member's Capital Account shall be credited with: (i) the Member's Initial Capital Contribution and any additional capital contributions; (ii) the fair market value of property contributed by the Member (net of liabilities assumed by the Company and liabilities to which the contributed property is subject); and (iii) all income (including income exempt from tax) and gain allocated to the Member.

**5.2.2** Each Member's Capital Account shall be debited with: (i) any cash distributed to the Member, (ii) the fair market value of property distributed to the Member (net of liabilities assumed by the Member and liabilities to which the distributed property is subject); (iii) all losses and other deductions allocated to the Member, and (iv) the Member's distributive share of Company expenditures which are not deductible in computing taxable income (these amounts shall be determined in accordance with this Agreement and Section 704(b) of the Internal Revenue Code).

The transferee of any Membership Interest shall succeed to the Capital Account of the transferor with respect to the specific Membership Interest transferred.

**Section 5.3** Compliance with Section 704(b) of the Internal Revenue Code. The provisions of this Article which relate to the maintenance of Capital Accounts are intended, and shall be construed and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to this Agreement to have substantial economic effect under the Regulations promulgated under §704(b) of the Internal Revenue Code, in light of the Capital Contributions and distributions made pursuant to this Agreement. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation.

**Section 5.4** Section 754 Election. If a Distribution of Company Property as described in §734 of the Internal Revenue Code or a transfer of a Membership Interest as described in §743 of the Internal Revenue Code occurs, then on the written request of any Member, the Company shall elect pursuant to §754 of the Internal Revenue Code to adjust the basis of Company Properties.

**ARTICLE 6**
**ALLOCATION OF PROFITS AND LOSSES AND DISTRIBUTIONS**

**Section 6.1** Profits and Losses. All Company Profits and Losses shall be allocated to the Members as follows:

**6.1.1** Profits. Profits shall be allocated to the Members in accordance with their Membership Interests, unless otherwise agreed upon by all Members in writing.

**6.1.2** Losses. All Losses shall be allocated to the Members in accordance with their Membership Interests, unless otherwise agreed upon by all Members in writing.

**6.1.3** Treatment for Tax Purposes. The allocation of Profits and Losses to any Member shall be deemed to be an allocation to that Member of the same proportionate part of each separate item of taxable income, gain, loss, deduction or credit which comprises Profits and Losses.

**6.1.4** Tax Allocations: Code Section 704(c). Notwithstanding any other provision of this Section, items of income, gain, loss, depreciation and cost recovery deductions attributable to contributed property shall, solely for tax purposes, be allocated among the Members in a manner provided in Code Section 704(c) so as to take into account any variation between the adjusted basis of such asset to the Company for federal income tax purposes and its fair market value on the date of its contribution to the Company. If the Capital Accounts of the Members are adjusted in connection with a revaluation for the Company's property under Treas. Reg. §1.704-

1(b)(2)(iv)(f) (which would occur in the event such as the acquisition of an additional interest in the Company by a new or existing Member in exchange for additional capital), then, notwithstanding the other provisions of this Section, items of income, gain, loss, depreciation and cost recovery deductions attributable to revalued property will thereafter be allocated among the Members in accordance with Code Section 704(c) and the regulations thereunder.

Allocations pursuant to this paragraph 6.1.4 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of profits, losses, other items or distributions pursuant to any provisions of this Agreement.

**6.1.5** Effect of Nonrecourse Debt. Notwithstanding any other provision of this Agreement to the extent required by Treas. Reg. §1.704-2(i), any items of income, gain, deduction or loss of the Company that are attributable to a nonrecourse debt of the Company that constitutes "partnership nonrecourse debt" as defined in Treas. Reg. §1.704-2(b)(4) (including chargebacks of Member nonrecourse debt minimum gain) will be allocated in accordance with the provisions of Treas. Reg. §1.704-2(i).

**Section 6.2** Reserve; Distributions. The Company shall accrue and maintain three (3) months of operating expenses ("Reserve") in a reserve account prior to any profit distributions. The Managers shall distribute all net revenue in excess of the Reserve, if any, to the Company's Members no less than once per quarter. Such distributions shall be divided among the Members in proportion to each Member's percentage of Membership Interests. For the purposes of this Section, none of the following amounts shall be considered as distributions: (i) reimbursements to Members for expenditures properly considered as costs or expenses of the Company; (ii) the payment of any reasonable fee for goods or services provided by any member or (iii) the repayment of any loan made by any Member (including interest and other charges accruing in connection with that loan).

**Section 6.3** Limitations on Distributions. No Distribution shall be declared and paid unless, after the Distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members with respect to their Capital Accounts.

## ARTICLE 7
## BUSINESS OF MEMBERS

Any Member may engage in or possess an interest in other business ventures of every nature and description. No Member shall be required to disclose or account to the Company or any other Member for any activities or income derived from any source. Neither the Company nor the other Members shall have any rights in any of these independent ventures or to the income and profits derived from them.

## ARTICLE 8
## INDEMNIFICATION

The Company shall indemnify and hold the Manager(s) and the Members harmless from and against any and all expenses, including attorneys' fees, judgments, fines, amounts paid in settlement and any other losses or damages actually incurred or sustained by any Member or Manager as a result of any action or omission arising out of or in any way related to Membership in the Company to the fullest extent permitted under the North Carolina General Statutes from time to time. This Section shall not be deemed to excuse the indemnified Member from bearing the same effects from the Company liability for the indemnification expense as that Member would bear for any other claim against the Company. This indemnification obligation shall be limited to and recoverable only out of Company assets and/or insurance and no Member shall have any personal liability as a result of this Section. This paragraph is subject to any separate agreement between the Members or between the Members and the Company regarding the assumption and/or sharing of liabilities to which property contributed to the Company is subject.

## ARTICLE 9
## OWNERSHIP AND TRANSFER OF MEMBERSHIP INTERESTS

**Section 9.1** Restriction on Transfer. No Membership Interest in the Company shall be transferred, except as provided in this Article.

**Section 9.2** Voluntary Transfers. No Member shall have the right to make any Voluntary Transfer of its Membership Interest unless it has delivered written notice of the terms and conditions of the proposed Voluntary Transfer to a Manager and each of the following has occurred:

**9.2.1** The Managers have delivered written notice to the Members including the name and address of the proposed transferee, the purchase price paid for the Membership Interest, the transferee's agreement to comply with the provisions of this Agreement and the assurances obtained pursuant to the preceding phrase;

**9.2.2** All requirements of applicable state and federal securities laws have been complied with to the satisfaction of the Manager;

**9.2.3** The Voluntary Transfer will not result in the Company's loss of any exemption (federal or state from the registration of the sale of securities) relied upon in its issuance of a Membership Interest;

**9.2.4** The remaining Member(s) representing a majority of the interests in the Company have consented to the Voluntary Transfer described in the notice; and

**9.2.5** The Managers have paid (or collected from the transferring Member) all costs and completed all filings associated with the Transfer.

Any third-party transferee acquiring a Membership Interest as provided in this Section shall be admitted as a Substitute Member in the Company and the transfer shall not result in the dissolution or termination of the Company.

**Section 9.3** Withdrawal. No Member may withdraw from the Company during the Company's existence without the unanimous approval of all other Members.

**Section 9.4** Securities Law Restrictions on Transfer. The Membership Interests issued in connection with this Agreement have not been registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended, or qualified under the securities laws of any state. The Membership Interests may not be offered for sale, sold, delivered after sale, transferred, pledged or hypothecated to any person other than the Company in the absence of proper registration and qualification or an opinion of counsel satisfactory to the Managers that registration and qualification are not required.

**Section 9.5** Right of First Refusal. In the event any Member elects to sell his or her interest, the other Member(s) shall have the right for a period of thirty (30) days following delivery of written terms of said offer, to match the purchase offer of any third party made on similar terms and conditions.

**Section 9.6** Death of a Member. In the event of death, each Member on behalf of itself and its heirs and assigns, agrees that the surviving Member(s) shall have the right of first refusal, whereby they can purchase the Membership Interest of the deceased Member, from the deceased Member's heirs or assigns, at a price that matches the purchase offer of any third party made on similar terms and conditions.

## ARTICLE 10
## ADMISSION OF NEW MEMBERS

**Section 10.1** Rights of Transferees. A transferee of a Membership Interest shall have the right to receive the share of tax allocations and distributions becoming payable with respect to the Membership Interests transferred to it. Unless and until a transferee is admitted as a Substitute Member, it shall have no right to appoint a Manager, to exercise any of the other powers, rights and privileges of a Member, or to participate in the management of the business and affairs of the Company.

**Section 10.2** Admission of Substitute Members. No transferee shall be admitted as a Substitute Member unless the Members by the Affirmative Vote of the Members holding a majority of membership interests (other than the interest held by the Member proposing the transfer) consents to admit the transferee and the transferee consents (in writing) to be bound by the terms and conditions of this Agreement. The Members may cast their votes for or against a transferee's admission for any reason in their sole and absolute discretion. If so admitted, the Substitute Member has all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Membership Interest. The admission of a Substitute Member, without more, shall not release the Member originally assigning the

Membership Interest from any liability to the Company that may have existed prior to the approval.

**Section 10.3** Admission of Additional Members. Additional Member(s) may be admitted to the Company only with the consent of, and on the terms and conditions unanimously determined by the Members, in their sole discretion. Any new Member shall specifically obligate itself to be bound by all of the terms and conditions of this agreement, as amended.

## ARTICLE 11
## DISSOLUTION AND LIQUIDATION

**Section 11.1** Dissolution. The Company may be dissolved by a unanimous vote of the Members.

**Section 11.2** Winding Up and Termination. Following dissolution, the Company shall wind up its business and terminate in accordance with North Carolina law. Either Manager may serve as "Liquidation Manager" or shall appoint a "Liquidation Manager," which may be the Manager or any other Person. If there is no Manager, then the Members shall elect a Liquidation Manager. The proceeds of liquidation shall be applied in the following order:

**11.2.1** To payment of creditors, other than Members, in the order of priority provided by law;

**11.2.2** To setting up any reserves which the Liquidation Manager deems reasonably necessary for the payment of any contingent or unforeseen liabilities or litigations of the Company. The balance of the funds and, at the expiration of a period determined by the Liquidation Manager, the balance of the reserves, shall be distributed in the following order:

**11.2.3** To the Members in payment of any Company indebtedness to them and then to the extent of their final capital accounts;

**11.2.4** To Members in proportion with their Membership Interests.

**Section 11.3** Deficit Capital Accounts. No Member shall be required to restore any deficit in its capital account balance.

**Section 11.4** Return of Contribution. Each Member shall look solely to the assets of the Company for return of its capital contribution. If the Company has insufficient funds to return this amount to the Members, then no Member shall be entitled to recourse against or compensation from any other Member for payment of this amount, except and to the extent that any Member has agreed in writing, signed by all affected Member(s), to indemnify another Member for loss attributable to property which was subject to liability at the time of its contribution to the Company.

## ARTICLE 12
## AMENDMENTS

This Agreement may be amended only by the majority written agreement of the Members.

## ARTICLE 13
## BUY/SELL

**Section 13.1** Buy/Sell**.** The terms used in this Section 13.1 relate solely to this Article 13 and do not alter the defined terms above or below this Article 13.

**13.1.1** Either Member ("Initiating Member") may by delivery of a written notice ("Buy-Sell Notice") to the other Member ("Responding Member") initiate the buy-sell procedures set forth in this Article.

**13.1.2** The Buy-Sell Notice shall contain the following terms: (i) a statement that the notice is the Buy-Sell Notice referred to in this Article 13, (ii) the offer price, which shall be equal to at least one-half of the value of all assets, including real property, then owned by the Company ("Offer Price"), and (iii) an irrevocable offer from the Initiating Member to the Responding Member to either (1) purchase all of Responding Member's membership units for the Offer Price, or (2) sell to the Responding Member all of Initiating Member's membership units for the Offer Price.

**13.1.3** Within sixty (60) days after receipt of the Buy-Sell Notice ("Response Period"), the Responding Member shall by delivery of a written notice to the Initiating Member ("Response Notice") elect to either (1) sell to the Initiating Member all of Responding Member's membership units for the Offer Price, or (2) purchase from the Initiating Member all of Initiating Member's membership units for the Offer Price.

**13.1.4** If the Responding Member does not deliver to the Initiating Member the required Response Notice during the Response Period, then, effective as of the first day following expiration of the Response Period, such failure shall be deemed to be an irrevocable acceptance and agreement of the Responding Member to sell to the Initiating Member all of the membership units owned by the Responding Member for ninety-five (95%) of the Offer Price. Any election or deemed election of the Responding Member with respect to the Buy-Sell Notice shall be irrevocable and shall be binding on both the Responding Member and the Initiating Member.

**13.1.5** The closing of the purchase and sale of membership units pursuant to this Article 13 ("Closing") shall be pursuant to a Membership Interest Purchase and Sale Agreement customary for transactions in which the buyer and seller are familiar with the issuer of the interest being purchased and sold




Doc ID: 19eb022926c6f75797d4c3b5f99a3da3c65065fad

and shall occur at the office of the Company or at such other location agreed upon by the Responding Member and the Initiating Member on a day no later than thirty (30) business days following the expiration of the Response Period.

**13.1.6** The membership units sold pursuant to this Article 13, shall be transferred free and clear of all liens, claims and encumbrances (other than those restrictions which bind all interests of the Company).

**13.1.7** The Company and each Member shall take all actions as may be reasonably necessary to consummate the purchase and sale contemplated by this Article 13, including entering into such agreements necessary to transfer such membership units described in this Agreement.

**13.1.8** At the Closing, the purchasing Member ("Purchasing Member") shall deliver the aggregate purchase price to be paid for the selling Member's ("Selling Member") membership units pursuant to this provision in immediately available United States funds.

**13.1.9** If the Selling Member shall default in its obligation to sell all of its membership units in accordance with the terms and conditions herein, then Buying Member shall have the right to purchase the membership units of the Selling Member for an amount equal to ninety percent (90%) of the Offer Price. Any claim of default must be provided in writing to the opposite party prior to the date of Closing.

**13.1.10** If the Buying Member (referred to as "Defaulting Member" here in subsection 13.1.10) shall default in its obligation to purchase all of the membership units of the Selling Member (referred to as "Non-Defaulting Member" herein subsection 13.1.10) in accordance with the terms of Article 13, then the Non-Defaulting Member shall have the right to purchase the membership units of the Defaulting Member for an amount equal to ninety percent (90%) of the Purchase Price which would have been paid to the Defaulting Member had the Non-Defaulting Member elected to purchase all of the Defaulting Member's membership units in response to the Buy-Sell Notice in accordance with Section 13.1.3 above ("Reverse Buy-Sell Default Price") or cancel the transaction requiring Initiating Member to re-initiate the process with a new Buy-Sell Notice. Any claim of default must be provided in writing, but may be provided up until, and including on, the date of Closing.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

**Section 14.1** Notices. All notices required by this Agreement will be sent by registered or certified mail or by private delivery service that provides receipts to the sender and recipient




Doc ID: 19a2029c6f75f9fd4e3b6f99a3da3c65065fad

to the latest known address of each Member. Each Member reserves the right to designate an additional address or a separate address for notices to be sent.

**Section 14.2** Severability. If any provision of this Agreement or the Articles is ultimately determined to be invalid or unenforceable, then the remaining terms and provisions shall be affected by that determination. Each remaining term and provision of this Agreement and the Articles shall be valid and shall be enforced to the fullest extent permitted by law. If the construction of any remaining term or provision is unclear as a result of this severability provision then that term or provision shall be construed in a manner most likely to carry out the original intention of the parties. If the applicable limited liability act is amended or interpreted in such a way so that any provision in this Agreement or the Articles which was previously held to be invalid becomes valid, then that provision shall be construed to have been reinstated from the effective date of that amendment or interpretation.

**Section 14.3** Successors and Assigns. Except as limited in this Agreement, this Agreement shall be binding upon and inure to the benefit of each of the Members and their respective legal representatives, heirs, executors, administrators, successors and assigns.

**Section 14.4** Title to Property. All real and personal property shall be titled and held in the Company name.

**Section 14.5** Waiver of Action for Partition. Each Member irrevocably waives any right to maintain any action for partition with respect to any real property titled in the Company name.

**Section 14.6** Governing Law. This instrument shall be governed by and construed in accordance with the laws of the State of North Carolina.

**Section 14.7** Statutory References. All references to statutory provisions and current or proposed rules and regulations (collectively "Laws") shall be deemed to include any amendment or other revision to those Laws and shall also be construed to refer to the corresponding provisions of any Laws enacted to replace Laws referenced in this Agreement.

[*Signature page to follow*]


Doc ID: 1ae20292c6f75f9a4e3b7f99a2da3c65065fad

This Agreement is executed this 5th day of April, 2023.

**1221 HOSPITALITY L.L.C.**

Nana Atakora

Nana Atakora-Bediako, Member

**3 VENTURES, LLC**

Isaiah Lynn, Member

**AKHENTHIANS INVESTMENTS LLC**

Napoleon Robinson

Napoleon Robinson, Member

**MJT VENTURES LLC**

Matthew Theirse, Member




Doc ID: [illegible]c6f75[illegible]c3b[illegible]a3c65065fad

## SCHEDULE A

| Member | Initial Capital Contribution | Membership Interest |
| --- | --- | --- |
| 1221 Hospitality L.L.C.<br>525 S Church St. #3705<br>Charlotte, NC 28202 | $825,000 | 79% of Membership Units |
| 3 Ventures, LLC<br>P.O. Box 33125<br>Charlotte, NC 28233 | $100,000 | 10% of Membership Units |
| Akhenthians Investments LLC<br>3010 Berry Creek Rd.<br>Charlotte, NC 28214 | $100,000 | 9% of Membership Units |
| MJT Ventures LLC<br>525 S Church St. #3005<br>Charlotte, NC 28202 | $100 | 2% of Membership Units |

| | |
|---|---|
| **Title** | Operating Agreement - Spice Tapas LLC |
| **File name** | Operating%20Agree...3%20-%20Final.pdf |
| **Document ID** | faeb02963c6f751914fc3b7f99a3da3c65065fad |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

This document was requested from app.clio.com

## Document History

| | | |
|---|---|---|
| SENT | 04 / 06 / 2023<br>09:46:13 UTC-4 | Sent for signature to Isaiah Lynn (isaiah@goteammates.com), Napoleon Robinson (napoleon1.robinson@gmail.com), Nana Atakora (nana@atakglobal.com) and Matthew Theirse (mattjtheirse@gmail.com) from derek@vanover.info<br>IP: 192.24.235.126 |
| VIEWED | 04 / 06 / 2023<br>09:53:48 UTC-4 | Viewed by Isaiah Lynn (isaiah@goteammates.com)<br>IP: 136.57.174.126 |
| SIGNED | 04 / 06 / 2023<br>09:54:03 UTC-4 | Signed by Isaiah Lynn (isaiah@goteammates.com)<br>IP: 136.57.174.126 |
| VIEWED | 04 / 06 / 2023<br>09:55:15 UTC-4 | Viewed by Nana Atakora (nana@atakglobal.com)<br>IP: 172.226.169.52 |
| SIGNED | 04 / 06 / 2023<br>09:55:31 UTC-4 | Signed by Nana Atakora (nana@atakglobal.com)<br>IP: 172.226.169.52 |
| | 04 / 06 / 2023<br>10:12:18 UTC-4 | Viewed by Napoleon Robinson (napoleon1.robinson@gmail.com)<br>IP: 104.28.57.204 |

Dropbox Sign

Audit trail

| | |
|---|---|
| **Title** | Operating Agreement - Spice Tapas LLC |
| **File name** | Operating%20Agree...3%20-%20Final.pdf |
| **Document ID** | faeb02963c6f751914fc3b7f99a3da3c65065fad |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

This document was requested from app.clio.com

## Document History

VIEWED

| | | |
|---|---|---|
| SIGNED | 04 / 06 / 2023<br>10:12:44 UTC-4 | Signed by Napoleon Robinson (napoleon1.robinson@gmail.com)<br>IP: 104.28.57.204 |
| VIEWED | 04 / 06 / 2023<br>10:52:06 UTC-4 | Viewed by Matthew Theirse (mattjtheirse@gmail.com)<br>IP: 69.132.80.23 |
| SIGNED | 04 / 06 / 2023<br>10:52:21 UTC-4 | Signed by Matthew Theirse (mattjtheirse@gmail.com)<br>IP: 69.132.80.23 |
| COMPLETED | 04 / 06 / 2023<br>10:52:21 UTC-4 | The document has been completed. |

Powered by Dropbox Sign