**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case 3:26-CV-00471-MOC-DCK**

| | |
|---|---|
| 3 VENTURES, LLC and MJT VENTURES LLC, individually and derivatively on behalf of SPICE TAPAS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>NANA ATAKORA, BAFFOUR ATAKORA, and 1221 HOSPITALITY LLC,<br><br>Defendants,<br><br>v.<br><br>SPICE TAPAS LLC,<br><br>Nominal Defendant. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

Plaintiffs' Verified Amended Complaint ("VAC") contains 242 paragraphs of well-pleaded allegations supporting 24 causes of action and spanning 50 pages, excluding 8 exhibits. Yet Defendants argue that Plaintiffs states only a single claim[1] upon which relief can be granted. In so doing, Defendants advance summary judgment arguments and ask the Court to not only resolve factual issues, including secondary meaning, likelihood of confusion, and whether managers acted in good faith, but to also draw all inferences in Defendants' favor. That is the opposite of the standard under Rule 12(b)(6).

Defendants also accuse Plaintiffs of lacking facts. First, the VAC is replete with well-pleaded factual allegations to support each claim, and it is far from a boilerplate complaint that

[1] The First Individual Claim for Inspection, which Defendants seek to narrow. (Doc. 22, p.20).

merely recites the elements. Second, to the extent that Plaintiffs lack any facts about Defendants' wrongdoing, that is because, as outlined in the VAC, Defendants have concealed those facts through their secretive operations of Spice and the infringing Spice Atlanta despite Plaintiffs' repeated demands for information to which they are entitled as Members of Spice. Consistent with their approach to management of Spice, Defendants now try to stave off discovery to prevent the light of Rule 26 from exposing their conduct. The Court should not reward Defendants' obstructionist tactics.

Because Plaintiffs' well-pleaded VAC states claims upon which relief can be granted, the Court should deny Defendants' Motion to Dismiss.[2]

## BACKGROUND

Spice Tapas LLC ("Spice") operates a restaurant in Charlotte. (VACFAM ¶ 80). Plaintiffs 3 Ventures, LLC and MJT Ventures LLC hold 10% and 2% of Spice; Defendant 1221 Hospitality LLC ("1221") holds the rest. (*Id.* ¶¶ 6, 12, 94). Defendants Nana and Baffour Atakora are two of 1221's three members, and Nana is its manager. (*Id.* ¶ 5). Spice's Operating Agreement appointed the Atakoras as Spice's managers for ten years unless they "are removed from office by majority agreement of the Members." (Doc. 17-1, § 4.2). Plaintiffs bought their interests in Spice from Nana under Membership Interest Purchase Agreements ("MPAs"), which forbid payments to the Atakoras or related parties "as an employee or contractor of the Company" without Plaintiffs' prior written approval. (Doc. 17-2, § 1.3; VAC ¶¶ 212–13).

In 2023, 1221 sold portions of its interest to third-party Baptiste Consulting LLC and to

[2] Plaintiffs consent to dismissal without prejudice of the following claims: Twelfth Derivative Claim for Aiding and Abetting Breach of Fiduciary Duty; Thirteenth Derivative Claim and Seventh Individual Claim in the Alternative for Unjust Enrichment as to 1221 Hospitality; and First Individual Claim for Violation of N.C. Gen. Stat. § 57D-3-04 as to the Atakoras.

Akhenthians Investments LLC, then a Member of Spice, without the notice, consent, or right of first refusal that the Operating Agreement requires. (VAC ¶¶ 42–47). The next year it bought them both out for $40,000 in September 2024 and for $135,000 in December 2024. (*Id.* ¶¶ 51–52). The Atakoras used Spice's funds to repurchase the membership interests on behalf of 1221. (*Id.* ¶ 53.)

On November 19, 2025, Plaintiffs—two of Spice's three Members—voted to remove the Atakoras as managers under § 4.2. (*Id.* ¶¶ 55–56). The Atakoras refused to recognize the vote. They continue to operate Spice and, upon information and belief, pay themselves from its funds. (*Id.* ¶¶ 57–58).

In May 2026, 1221 and the Atakoras opened "Spice Atlanta," a carbon copy of Spice. (*Id.* ¶ 59). Spice Atlanta's website reproduces Spice's footer, "About Us" page, and "Careers" page; its exterior signage uses the same font, size, and color; its cocktail menu is identical in names, ingredients, order, and prices; and most of its other dishes are the same and priced the same. (*Id.* ¶¶ 68–78). Both websites describe each restaurant as "a 1221 Hospitality concept." (*Id.* ¶ 132). Yet Spice never licensed its name or brand to Spice Atlanta, and it has no say over Spice Atlanta's quality or operations. (*Id.* ¶¶ 63–65, 133).

Plaintiffs made three derivative demands on Spice, with the last being on June 16, 2026 in connection with the newly discovered wrongdoing related to Spice Atlanta. (*Id.* ¶¶ 90–93; Docs. 17-3, 17-6, 17-8). The original Complaint asserted derivative claims arising from the repurchases, the removal, the Atakoras' continued use of Spice's funds, and Spice's records, but the claims related to Spice Atlanta were brought as direct rather than derivative claims. (Doc. 1, ¶¶ 80–160.) Spice acted on none of the demands. (VAC ¶ 94.) On September 21, 2026, after the June demand's ninety days had run, Plaintiffs filed the Amended Complaint, which raised derivative claims related to Spice Atlanta.

## LEGAL STANDARD

Under Fed. R. Civ. P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See also Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) ("Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007))). In reviewing a 12(b)(6) motion, the Court must accept as true all factual allegations in Plaintiffs' complaint and draw all reasonable inferences therefrom in the light most favorable to Plaintiffs. *Twombly*, 550 U.S. at 555–56. A Rule 12(b)(6) motion tests the "legal sufficiency of the complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Hayward Indus., Inc. v. Ningbo C.F. Elec. Tech Co.*, No. 3:20-CV-00710-FDW-DSC, 2021 WL 2187953, at *4 (W.D.N.C. May 28, 2021) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

## ARGUMENT

### I. The Federal Claims State Plausible Claims Upon Which Relief May Be Granted.

#### A. The Fifth, Sixth, and Ninth Individual Claims are Asserted in the Alternative.[3]

Defendants argue that the Fifth and Ninth Individual Claims fail because they allege that Plaintiffs'—rather than Spice—own the intellectual property at issue. (Doc. 22, p. 6). This argument ignores that these claims are explicitly alleged in the alternative:

- "To the extent that the Third Derivative Claim fails because it is determined that Spice does not own its intellectual property, . . . Plaintiffs own Spice's intellectual property . . . under Section 1.4 of the MPAs." (VAC ¶ 217).

[3] The same is true for the Seventh, Eighth, Tenth, and Eleventh Individual Claims. (VAC ¶¶ 226, 230, 238, 241).

- "To the extent that the Sixth Derivative Claim fails because it is determined that Spice does not own its trade secrets, Plaintiffs own Spice's trade secrets under Section 1.4 of the MPAs." (*Id.* ¶ 235).

Rule 8(d)(2)–(3) expressly authorizes alternative pleadings, "regardless of consistency," and the "pleading is sufficient if any one of them is sufficient." That is exactly what Plaintiffs did.

To be clear, Plaintiffs' primary allegations are that "Spice owns the intellectual property associated with the 'Spice' name, marks, and brand, including its trade name and service marks," and that Spice "owns trade secrets." (VAC ¶¶ 109, 143). And Defendants appear to agree for now. (Doc. 22, p. 6). Yet under Section 1.4 of the MPAs, Nana Atakora, who owned 100% of the membership interest units in Spice, purported to transfer "the rights and obligations associated with [Spice's] assets" to Plaintiffs, including "[Spice's] property, . . . goodwill, intellectual property, and the 'Spice Tapas' brand." (Doc. 17-2, pp. 1-2, 11). In other words, Nana Atakora purported to transfer ownership rights to Plaintiffs that he now disclaims. That creates a question of fact about whether Nana Atakora or Spice owned the intellectual property at issue at the time of the MPAs and, while an LLC is distinct from its members, that does not preclude the LLC's intellectual property from being owned by members.

Thus, until they have a better understanding of Nana Atakora's purported ownership of Spice's intellectual property and to protect against any flip-flopping, Plaintiffs allege their Fifth and Ninth Individual Claims in the alternative. To the extent that Defendants stipulate to Spice's ownership of the intellectual property and trade secrets at issue (or if judicial estoppel applies based on the statements in Defendants' brief), then these claims pleaded in the alternative may be dismissed. Until that is secured, Plaintiffs should be allowed to proceed on their claims in the alternative and Defendants will not be prejudiced by this because the legal theories and scope of discovery overlap with the corresponding primary derivative claims.

Next, Defendants challenge the Sixth Individual Claim as alleging "no injury to [Plaintiffs' own commercial sales or reputation independent of Spice's." (Doc. 22, p.6). Again, the Sixth Individual Claim is pleaded in the alternative to the Fifth Derivative Claim to the extent that Spice does not own its intellectual property. (VAC ¶ 221). If, in the alternative, Plaintiffs own the Spice brand, Plaintiffs have sufficiently alleged that 1221's and the Atakoras' false advertisement of Spice Atlanta being affiliated with Spice has caused Plaintiffs injury, by infringing on Plaintiffs' title to that intellectual property. (VAC ¶¶ 221-24). As with the Fifth and Ninth Individual Claims, however, the Sixth Claim may be dismissed to the extent that Defendants stipulate to Spice's ownership of the intellectual property (or if judicial estoppel applies).[4]

### B. Because "Spice" is a Protectable Mark, Plaintiffs' Third Derivative Claim for Trademark and Trade-Name Infringement under the Lanham Act Survives.

To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege (1) that it owns a valid and protectable mark, and (2) that the defendant's use of a reproduction, counterfeit, copy, or colorable imitation of that mark creates a likelihood of confusion. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 660 (4th Cir. 2018). The VAC pleads both. Spice has used "Spice" as the name of its restaurant continuously since 2023—on its signage, website, social media, and advertising. (VAC ¶¶ 80, 114–117). Spice Atlanta uses the identical name for a competing restaurant, with the same signage font, the same website content, and the same menus, and it does so without Spice's authorization. (*Id.* ¶¶ 59, 63–65, 68–78). Defendants challenge whether "Spice" is distinctive and whether Spice Atlanta's use of the mark creates a likelihood of confusion. Each is a question of fact.

---

[4] The Seventh, Eighth, Tenth, and Eleventh Individual Claims are likewise pleaded in the alternative for the same reasons.

*1. The "Spice" Mark is Distinctive.*

First, "the genericness or distinctiveness of a mark is a question of fact." *Moke Am. LLC v. Moke Int'l Ltd.*, 126 F.4th 263, 286 (4th Cir. 2025). That alone should defeat Defendants' Motion on this issue. But Defendants also admit that "Spice" is "at least arguably descriptive." (Doc. 22, p.7.) "[A]rguably" equals a factual dispute, which defeats Defendants' Motion, especially when viewing the allegations and resolving all inferences in the light most favorable to Plaintiffs.

Defendants also argue that the VAC contains "no facts plausibly establishing secondary meaning," which is required to the extent that "Spice" is descriptive rather than suggestive. (*Id.* p.7). Not so.

At the outset, "courts generally deny motions to dismiss claims for lack of secondary meaning" because "'[p]roof of secondary meaning entails vigorous evidentiary requirements, and thus secondary meaning is factual in nature and typically ill-suited for a motion to dismiss.'" *MC1 Healthcare LLC v. Mountainside Sols., Inc.*, No. 1:18-CV-00315-MR, 2020 WL 1923163, at *10 (W.D.N.C. Apr. 21, 2020) (quoting *Camco Mfg., Inc. v. Jones Stephens Corp.*, 391 F. Supp. 3d 515, 522 (M.D.N.C. 2019)); *see also Corolla Pool & Spa Inc. v. Corolla Brad LLC*, No. 2:24-CV-54-BM, 2025 WL 2663865, at *1 (E.D.N.C. Sept. 17, 2025) (denying motion to dismiss due to "relatively low bar that plaintiff most overcome at this state of the proceedings given the fact-specific nature of the [secondary meaning] inquiry").

Here, the analysis is straightforward: "evidence of intentional direct copying establishes a prima facie case of secondary meaning." *Mud Pie, LLC v. Belk, Inc.*, No. 318CV00607RJCDCK, 2019 WL 3268823, at *3 (W.D.N.C. July 18, 2019) (quoting *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 163 (4th Cir. 1990)). In *Camco*, the court held that the complaint "pleaded sufficient factual allegations" of "direct copying" when it contained "pictures showing

that Defendants' products are nearly identical to those of Camco." 391 F. Supp. 3d at 523. This Court reached the same conclusion when the complaint attached side-by-side images comparing the plaintiffs' and defendants' products. *Someecards v. SnarkeCards, LLC*, No. 3:14-CV-00097-FDW, 2014 WL 3866024, at *2 (W.D.N.C. Aug. 6, 2014); see also *Mud Pie*, 2019 WL 3268823, at *4 (denying motion to dismiss when plaintiff alleged that defendants "intentionally and directly copied its products").

As with *Camco* and *Someecards*, the VAC alleges that 1221 and the Atakoras directly copied the "Spice" mark and trade name in connection with the creation and operation of Spice Atlanta, and the VAC provides proof by including pictures of the direct copying via signage, social media pages, websites, and menus. (VAC ¶¶ 73-78). Thus, Plaintiffs have shown a prima facie case of secondary meaning.

Even if the Court were to consider the other factors for whether there is secondary meaning—"(1) long use; (2) advertising; (3) sales volume; and (4) identity of service or origin in the minds of the purchasing public"—the VAC satisfies those too. *Camco*, 391 F. Supp. 3d at 522 (quoting *Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 660 (4th Cir. 1996)). Spice has used the mark continuously since it opened in 2023—about three years before Spice Atlanta opened—on all its signage, social media, website, and advertising, including in promoting the restaurant for Charlotte Restaurant Week in January 2026. The mark is known and used in North Carolina, South Carolina, and Georgia, including on applications like Yelp and OpenTable. And because of Spice's advertising and branding, consumers associate "Spice" with the Charlotte restaurant. (VAC ¶¶ 80, 114–117).

In addition, Plaintiffs contend that "Spice" is suggestive rather than descriptive, in which case it is a presumptively valid mark. "[I]f the mark . . . stands for an idea which requires some

operation of the imagination to connect it with the goods, it is suggestive." *Variety Stores*, 888 F.3d at 662 (citation and quotation marks omitted). As the name of a tapas restaurant, "Spice" evokes flavor, but it does not say what the restaurant serves; a diner must supply some imagination to connect the word to the place. "Spice" also has a double meaning, in that it also refers to the lively atmosphere of the restaurant. Thus, "Spice" is suggestive. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1534 (4th Cir. 1984) (holding that district court clearly erred in finding that "Pizzeria Uno" was descriptive rather than suggestive).

In sum, 1221 and the Atakoras copied "Spice" in connection with Spice Atlanta precisely because "Spice" is distinctive. Plaintiffs have sufficiently alleged that "Spice" is a protectable mark.

2. *Spice Atlanta's Infringement Creates a Likelihood of Confusion.*

Next, Defendants appear to argue that there is no "likelihood of confusion." (Doc. 22, p.7). "Whether there is a likelihood of confusion by customers is an especially fraught, fact-dependent inquiry." *Hayward Indus., Inc. v. Blue Works Corp.*, No. 3:20-CV-710-MOC-DSC, 2024 WL 289859, at *5 (W.D.N.C. Jan. 25, 2024). "As a result, in the mine run of cases, a complaint will not be dismissed pursuant to Rule 12(b)(6) on the basis of an insufficient likelihood of confusion." *Clear Def., L.L.C. v. ClearDefense Pest Control of Greensboro, LLC*, No. 1:17-CV-01139, 2018 WL 5281912, at *4 (M.D.N.C. Oct. 24, 2018).

The VAC pleads a likelihood of confusion. As Defendants argue, Spice—not 1221 or the Atakoras—owns its intellectual property. And Spice Atlanta is using the "Spice" mark without authorization. (VAC ¶¶ 59, 63–65, 110, 120, 133). Spice Atlanta's unauthorized use of the mark is likely to cause confusion among consumers about the relationship—or lack thereof—between Spice Atlanta and Spice. (VAC ¶¶ 120, 127, 158). Confusion "as to affiliation, connection or

sponsorship" is the type of confusion the Lanham Act protects against. *Clear Def.*, 2018 WL 5281912, at *9 (quoting *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 157 (4th Cir. 2012)). The Fourth Circuit has recognized the likelihood of confusion when restaurants include similar names, even when the restaurants are entirely different concepts. *Pizzeria Uno*, 747 F.2d at 1536 (holding that district court's finding that there was no likelihood of confusion between "Pizzeria Uno," an Italian sit-down restaurant and "Taco Uno," a Mexican fast food restaurant, was clearly erroneous); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 937 (4th Cir. 1995) (noting evidence demonstrated likelihood of confusion for different restaurant concepts with "Lone Star" in their names). The likelihood of confusion is even more obvious here given that Spice Atlanta is a carbon copy of Spice.

Again, 1221 and the Atakoras copied "Spice" for a reason. "The presumption that intentionally copying someone else's mark causes a likelihood of confusion arises from the recognition that one who tries to deceive the public should hardly be allowed to prove that the public has not in fact been deceived." *Shakespeare Co. v. Silstar Corp. of Am.*, 110 F.3d 234, 239 (4th Cir. 1997). The Court should deny Defendants' motion as to the Third Derivative Claim for trademark infringement under the Lanham Act.

**C. The Fifth Derivative Claim Pleads Actionable False Advertising.**

To state a claim for false advertising, a plaintiff must allege that "(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result

of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (citation omitted). Defendants argue that (1) Plaintiffs really allege a trademark infringement claim under Section 43(a)(1)(A) of the Lanham Act, and (2) Plaintiffs failed to plausibly allege injury. (Doc. 22, pp. 8-9).

Section 43(a) "creates two distinct bases of liability," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014), and a party may plead both, Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs' Third Derivative Claim covers the trademark infringement (and false association) claim under Section 43(a)(1)(A). This Fifth Derivative Claim is distinct, and alleges each required element for false advertising under Section 43(a)(1)(B).

The VAC alleges that, among other things, the website calling Spice a "1221 Hospitality concept" and having the Spice and Spice Atlanta websites say "Welcome to 1221 Hospitality" constitutes a false representation about the nature, characteristics, and qualities of Spice. (VAC ¶¶ 131–134). It alleges these misrepresentations are material, and are likely to influence the purchasing decision. (*Id.* ¶ 135). It alleges that the misrepresentations are likely to deceive and do in fact deceive consumers. (*Id.*) And it alleges that the misrepresentations are in and affecting interstate commerce, through the use of websites and social media. (*Id.* ¶ 139).

Finally, citing specific negative reviews about Spice Atlanta, the VAC alleges that the misrepresentations have damaged Spice's goodwill by causing consumers to equate issues with Spice Atlanta with Spice, leading them to avoid Spice. (*Id.* ¶¶ 136-37). Defendants, however, argue that Plaintiffs must *prove* an injury right now. (Doc. 22, p.9) (arguing that Plaintiffs "failed to identify" a specific "consumer who mistakenly attributed an Atlanta experience to the Charlotte restaurant."). That is not the standard. Indeed, Plaintiffs need not even allege actual injury. They

must only allege that they are "likely to be injured," which they have done.

### D. The Sixth Derivative Claim Identifies Trade Secrets and Alleges Facts Supporting an Inference of Misappropriation.

To state a claim under the Defend Trade Secrets Act ("DTSA"), a plaintiff must allege that it possessed a valid trade secret and that the trade secret was misappropriated. *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025). A trade secret is information that is subject to reasonable measures to keep such information secret and which derives independent economic value from its secrecy. *Id.* "At the pleading stage, identifying the trade secret with sufficient particularity means describing the trade secret at a level of detail that enables a defendant to delineate that which he is accused of misappropriating." *Id.*

Defendants concede that the alleged "proprietary recipes, negotiated supplier prices, cost structures, and operational processes may qualify as trade secrets." (Doc. 22, p.10). The VAC also identifies: (a) menu compositions and menu-pricing methodologies derived from Spice's cost structure and market analysis; (b) the identities of specialized food-product suppliers, negotiated pricing and volume-discount arrangements, and sourcing channels for particular ingredients; (c) kitchen workflow and station organization, training protocols, service standards, and hiring criteria; (d) revenue projections, profit-and-loss data, and annual plans of operation; and (e) Spice's brand strategy, including its website architecture, content strategy, and social-media marketing approach. (VAC ¶ 82).

Courts routinely recognize allegations like these as satisfactory. *Chase Corp. v. Barefoot*, No. 1:24CV351, 2025 WL 641932, at *10 (M.D.N.C. Feb. 27, 2025) ("business model and the development and processing of certain SAP Products, including Plaintiff's pricing and Financials for those products, and 'customers' technical specifications'"), *report and recommendation adopted sub nom.*, 2025 WL 969359 (M.D.N.C. Mar. 31, 2025); *Omni Logistics, LLC v. Wells*,

No. 1:25-CV-23-MR-WCM, 2025 WL 4036404, at *3 (W.D.N.C. Dec. 22, 2025) ("business methods, techniques, processes, ... lists of actual or potential customers or suppliers[,] . . . key account contacts and customer lists, insurance requirements and confidential service agreements between the previous business owner and customers, and pricing templates"), *report and recommendation adopted*, 2026 WL 95428 (W.D.N.C. Jan. 13, 2026); *see also GE Betz Inc. v. Conrad*, 752 S.E.2d 634, 649 (N.C. App. Ct. 2013) ("pricing information, customer proposals, historical costs, and sales data"); *Bldg. Ctr., Inc. v. Carter Lumber Inc.,* No. 16-cvs-4186, 2016 WL 6142993, at *10 (N.C. Super. Ct. Oct. 21, 2016) ("names and contacts of customers; customer preferences, including the needs, requirements, and values of [plaintiff's] customers; sales and marketing strategies; pricing structures; margins and profits; manufacturing technologies; and other confidential business information"); *LeBleu Corp. v. B. Kelley Enters.*, 2014 NCBC LEXIS 66, at *12 (N.C. Super. Ct. Dec. 9, 2014) ("customer lists, pricing information, transaction histories, key contacts, and customer leads"); *S. Fastening Sys. v. Grabber Constr. Prods.*, No. 14-cvs-4260, 2015 WL 2031007, at *4 (N.C. Super. Ct. Apr. 28, 2015) ("confidential customer information such as customer contact information and customer buying preferences and history . . . sales reports, prices and terms books, . . . and information concerning [plaintiff's] relationship with its vendors").

Applying these cases to the VAC, it sufficiently identifies the trade secrets that 1221 and the Atakoras are alleged to have misappropriated.

Defendants also challenge the allegations of measures taken to preserve secrecy. As an obvious example of such measures, Defendants will not even disclose the alleged trade secrets to Plaintiffs, who are members of Spice. The VAC further alleges that access was limited to the Atakoras and key employees on a need-to-know basis and that the information was maintained on

confidential internal systems. (VAC ¶¶ 145, 151). Nor do Plaintiffs contend that any publicly available information is a trade secret. Instead, they claim that the underlying confidential information on which certain public information is based constitutes trade secrets.

Finally, Defendants argue that Plaintiffs "fail to plausibly allege misappropriation," attacking Plaintiffs for relying on inferences because they lack specific proof that is within the exclusive possession, custody, and control of 1221 and the Atakoras. (Doc. 22, p.10). Plaintiffs do not have to prove their case at the motion to dismiss stage. As managers, the Atakoras had access to Spice's trade secrets. They then, acting through 1221, opened a carbon copy Spice Atlanta that reproduces Spice's products, pricing, and operations. (VAC ¶¶ 75-76, 85, 146-47, 152-153.) They had access to Spice's information "solely by virtue of their positions as Managers," on the condition that they act in Spice's best interests, and they used it to build a competing restaurant for 1221 and themselves. (*Id.*) Viewing the allegations and drawing all inferences in the light most favorable to Plaintiffs, they have plausibly alleged misappropriation.

The Fourth Circuit recently reversed the dismissal of a trade-secret claim on similar allegations. *Samuel Sherbrooke Corp., Ltd v. Mayer*, 159 F.4th 252, 258–59 (4th Cir. 2025). There, shareholders, directors, and officers of a company took the company's trade secrets and "created a competing business," using the trade secrets to "assist that competing business." *Id.* at 258. As the Fourth Circuit put it, "what does one do with a stolen competitive pricing software except 'use' it, as alleged in this case, 'to assist with operating this new competing insurance entity'?" *Id.* at 258–59. The same is true here. The Court should allow Plaintiffs' DTSA claim to proceed.

### E. Plaintiffs Have Standing to Bring the Third, Fifth, and Sixth Derivative Intellectual Property Claims.

Defendants argue that under no circumstances may a complaint be amended to include additional derivative claims discovered in the course of litigation—even when the statutory

derivative demand requirement is satisfied. (Doc. 22, pp. 11-12). Instead, Defendants argue that Plaintiffs must waste the Court's and parties' resources by filing a new piecemeal lawsuit as to any newly-discovered derivative claims. (*Id.*) This form over function argument is wrong.

A member may bring a derivative action if it "made written demand on the LLC to take suitable action, and either (i) the LLC notified the member that the member's demand was rejected, (ii) 90 days have expired from the date the demand was made, or (iii) irreparable injury to the LLC would result by waiting for the expiration of the 90-day period." N.C. Gen. Stat. § 57D-8-01(a)(2).

Plaintiffs served an initial derivative demand on January 24, 2025. (Doc. 17-3). That demand went unanswered. They then served a second derivative demand on March 9, 2026. (Doc. 17-6). That, too, went unanswered. (VAC ¶ 54). So Plaintiffs filed the Complaint on June 16, 2026, after 90 days had expired. (Doc. 1). That same day, Plaintiffs issued a third derivative demand, addressing the recently discovered opening of Spice Atlanta and the corresponding intellectual property infringement in connection with same. (Doc. 17-8). Critically, the Complaint alleged no derivative claims related to Spice Atlanta. (*See generally* Doc. 1). Instead, the allegations related to Spice Atlanta exclusively supported individual claims by Plaintiffs, which Defendants then challenged on the basis that the "alleged injury belongs to Spice and should have been brought derivatively" (Doc. 7, p.4). Again, Defendants ignored the third demand. (VAC, ¶¶ 90-95). Thus, after the expiration of 90 days, Plaintiffs moved for leave to amend the Complaint to add the intellectual property and trade secret claims related to Spice Atlanta. (Docs. 13, 13-1, 13-2, 14). Defendants did not oppose the motion, and the Court granted leave to amend to add the Third, Fifth, and Sixth Derivative Claims (Doc. 16) that Defendants now contend must be brought in a new federal court action.

That sequence distinguishes this case from Defendants' two cases. In *Tiller v. Phillips*, the

plaintiffs filed their complaint contemporaneously with the issuance of their *first* derivative demand. No. 24CV048534-590, 2025 WL 2926242, at *11 (N.C. Super. Oct. 15, 2025). The court therefore held that the amended complaint could not cure the lack of standing when they never had standing to bring any derivative action. *See id.* Likewise, the plaintiff in *Garlock v. Hilliard* issued the *first* derivative demand contemporaneously with the filing of the complaint. No. 00-CVS-1018, 2000 WL 33914616, at *3 (N.C. Super. Aug. 22, 2000). But *Garlock* did not address the ability to amend a complaint to assert derivative claims after waiting 90 days after the complaint was filed.

In contrast to *Tiller* and *Garlock*, Plaintiffs' initial Complaint was filed after the statutory waiting period had expired for *two* derivative demands, and the initial Complaint did not assert any derivative claims that were the subject of the third derivative demand issued contemporaneously with the Complaint. Put simply, the *Tiller* and *Garlock* plaintiffs brought derivative claims prior to the expiration of the statutory waiting period, whereas Plaintiffs here brought no claims until after the expiration of the statutory waiting period for the corresponding derivative demands. At least one North Carolina Business Court case has allowed derivative claims to proceed even when the initial complaint was filed only five days after issuance of the demand because, by the time the court ruled, 90 days had passed without action. *Petty v. Morris*, No. 14 CVS 7741, 2014 WL 7591073, at *9 (N.C. Super. Dec. 16, 2014).[5]

Thus, to dismiss the Third, Fifth, and Sixth derivative claims only so that they may be filed again would serve no interest the statute protects given that Spice had 90 days to address the demand and failed to do so, and it would cut against the command that the Rules be applied "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R.

---

[5] In addition, the waiting period does not apply when the company faces irreparable harm, which Plaintiffs have alleged. (VAC ¶¶ 122, 129).

Civ. P. 1.

## II. The State-Law Claims State Plausible Claims Upon Which Relief May Be Granted.

### A. The Fourth Derivative Claim for Common Law Infringement Survives for the Same Reasons as the Lanham Act Infringement Claim.

Because "the tests for trademark infringement and unfair competition under the Lanham Act are essentially the same as that for common law unfair competition under North Carolina common law," Plaintiffs common law infringement claim survives for the same reasons as their Lanham Act infringement claim. *Georgia Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 449 (4th Cir. 2010).

### B. The Seventh Derivative Claim for Misappropriation Under North Carolina Law Survives for the Same Reasons as the DTSA Claim.

Because the DTSA and North Carolina's Trade Secrets Protection Act ("TSPA") "define a trade secret in substantially the same terms" and have similar elements, Plaintiffs' TSPA claim survives for the same reasons as their DTSA claim. *Joe Gibbs Racing, LLC v. Gabehart*, No. 3:26-CV-00133-SCR-DCK, 2026 WL 1196529, at *7-9 (W.D.N.C. Apr. 23, 2026) (citing *Sysco*, 143 F.4th at 228). The VAC identifies the trade secrets at issue with sufficient particularity. *Channeltivity, LLC v. Allbound, Inc.*, No. 3:20-CV-611-RJC-DCK, 2021 WL 4484576, at *5 (W.D.N.C. Sept. 2, 2021) (plaintiff need not "define every minute detail of its trade secrets down to the finest detail"), *report and recommendation adopted,* 2021 WL 4477078 (W.D.N.C. Sept. 29, 2021). As for misappropriation, the North Carolina Supreme Court held that allegations of misappropriation were sufficient even when the plaintiff did "not expressly allege that [defendant] ever accessed Wells Fargo's trade secrets without authorization and consent," and instead only alleged that he had access to the information and, upon information and belief, he used the information to solicit customers. *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 281-82

(2019). Even though "[a] significant inferential leap" was required to conclude that misappropriation occurred, the allegations satisfied the TSPA. *Id.* at 282. Here, the VAC alleges that the Atakoras accessed the trade secrets through their positions as Managers, and they and 1221 then used them without authorization or consent in connection with the creation, opening, and operation of Spice Atlanta. (VAC ¶¶ 152-53). The inference of misappropriation here is a short step, not a leap. *See also Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 722 (M.D.N.C. 2009) ("Courts have found misappropriation where a former employee had access to confidential information or helped a competitor quickly deliver new products to market.").

**C. The Eighth Derivative Claim for Unfair and Deceptive Trade Practices Survives Because Violations of the Lanham Act Also Violate North Carolina's UDTPA.**

"[I]t is well settled in North Carolina that unfair competition under the Lanham Act may constitute unfair or deceptive practices under the UDTPA." *Controls Se., Inc. v. QMax Indus., Inc.*, No. 3:21-CV-302-MOC-DSC, 2024 WL 2163477, at *8 (W.D.N.C. May 14, 2024) (internal quotation marks and citation omitted) (holding that UDTPA claim survived summary judgment because Lanham Act claim survived); *see also Hayward Indus., Inc. v. Blueworks Corp.*, No. 3:20-CV-710-MOC-DSC, 2025 WL 310112, at *4 (W.D.N.C. Jan. 27, 2025) ("Defendants' conduct for which they are liable under the Lanham Act—their false or deceptive advertising—is the same conduct for which they are liable under the UDTPA."), *aff'd,* No. 25-1396, 2026 WL 810923 (4th Cir. Mar. 24, 2026). Likewise, "successfully pleading misappropriation of trade secrets also carries a UDTPA claim." *Nutrien AG Solutions, Inc. v. Meherrin Agricultural & Chemical Co.*, No. 1:25-CV-469, 2026 WL 2943084, at *17 (M.D.N.C. Sept. 30, 2026) (collecting cases). Thus, because Plaintiffs' Lanham Act and misappropriation of trade secret claims survive, their UDTPA claim also survives.

Contrary to any suggestion otherwise by Defendants (Doc. 22, pp.13-14), Plaintiffs' UDTPA claim is predicated on the underlying conduct of "trademark and trade name infringement and false advertising under the Lanham Act and North Carolina common law and misappropriation of trade secrets" rather than any internal governance dispute. (VAC ¶159).

**D. The Thirteenth Derivative Claim for Unjust Enrichment Alleges a Benefit Conferred on the Atakoras.**

Defendants challenge whether the VAC alleges conferral of a benefit to sustain an unjust enrichment claim. (Doc. 22, p.14). To state a claim for unjust enrichment under North Carolina law, the plaintiff must allege (1) it conferred a benefit on another party, (2) the other party consciously accepted the benefit, and (3) the benefit was not conferred gratuitously. *Recon Grp. LLP v. Lowe's Home Centers, LLC*, 743 F. Supp. 3d 737, 750 (W.D.N.C. 2024). In *Recon*, the plaintiff alleged a claim for unjust enrichment when it alleged that (1) it allowed the defendant to use its proprietary information under their agreement; (2) the defendant actually used the information; and (3) after terminating the agreement, the defendant continued to use the information without paying a licensing fee. *Id.* So too here. Spice entrusted the Atakoras, as its Managers, with access to its trade secrets, the Atakoras accepted the conferral of that benefit by using those trade secrets, and then the Atakoras continued to use those trade secrets after their removal as Managers and in an unauthorized manner with respect to Spice Atlanta, unjustly enriching themselves in the process. (VAC ¶¶ 85, 152, 184-86).

**E. Plaintiffs' First Derivative Claim for Declaratory Judgment States a Claim.**

Under North Carolina law, Courts "shall have power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed." N.C. Gen. Stat. § 1-253. "It is not a high bar to state a claim for declaratory relief, so a 'motion to dismiss for failure to state a claim is seldom appropriate in actions for declaratory judgments.'" *Sunbelt Rentals, Inc. v.*

*Niagara Mach., Inc.*, No. 24CV027482-910, 2026 WL 2117226, at *6 (N.C. Super. July 22, 2026) (quoting *Morris v. Plyler Paper Stock Co.*, 89 N.C. App. 555, 557 (1988)). "Rather, a motion to dismiss a declaratory-judgment claim is appropriate only when the complaint does not allege an actual, genuine existing controversy." *Id.* (internal quotation marks and citation omitted). This is because the "'issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.'" *Morris*, 89 N.C. App. at 557 (quoting *Johnson v. Bollinger*, 86 N.C. App. 1, 4 (1987)). Thus, "[i]n the context of a claim for declaratory relief, a motion to dismiss is generally not the appropriate means by which to establish substantively whether a plaintiff should prevail on its claim." *Indus. Servs. Grp., Inc. v. Dobson*, No. 1:21-CV-00090-MR-WCM, 2022 WL 954999, at *8 (W.D.N.C. Jan. 7, 2022), *report and recommendation adopted,* 2022 WL 949876 (W.D.N.C. Mar. 29, 2022), *aff'd,* 68 F.4th 155 (4th Cir. 2023).

Defendants put the cart before the horse, arguing the merits of why they should win the declaratory judgment claim rather than challenging whether there is an actual, genuine existing controversy. (Doc. 22, pp. 15-16). That alone defeats Defendants' Motion on this claim. In any event, even when engaging in a merits-based analysis, Plaintiffs' claim thrives.

First, Defendants argue that the removal of the Atakoras was ineffective because they contend that a vote of the majority of Membership Interest rather than a majority of Members was required to remove the Atakoras as Managers under Section 4.2 of the Operating Agreement. But that is not what Section 4.2 says. Instead, Section 4.2 states, "The initial Managers shall hold office . . . unless they . . . are removed from office by majority agreement of the Members." (Doc. 17-1). Critically, this language is dramatically different from other provisions of the Operating Agreement, in which the parties made clear that Membership Interest—rather than the quantity of Members—applied:

- "No transferee shall be admitted as a Substitute Member unless the Members by the Affirmative Vote of the Members **holding a majority of membership interests** . . . consents to admit the transferee." (*Id.* § 10.2) (emphasis added).

- "The remaining Member(s) representing **a majority of the interests in the Company** have consented . . .." (*Id.* § 9.24) (emphasis added).

Thus, the parties knew how to draft language requiring a majority of membership interests when they wanted to do so. That they did so in other provisions of the Operating Agreement, but not with respect to Section 4.2 speaks volumes. When parties include language in one provision but omit it from another, it is presumed that the difference was intentional. *Kotis Props., Inc. v. Casey's, Inc.*, 183 N.C. App. 617, 623 (2007) ("We must presume that inclusion of this waiver in one part of the Lease, but not in a corollary part, reflects the deliberate intent of the contracting parties.").

Defendants also argue that Section 3.5 applies to the removal of the Atakoras under Section 4.2, but Section 3.5 concerns "Voting" whereas Section 4.2 requires only "majority agreement" rather than a "vote" to remove the Atakoras as Managers. (Doc. 17-1). In contrast, later within Section 4.2, it explicitly requires a unanimous "vote" of the Members to elect managers after the expiration of the Atakoras' initial term as Managers. (*Id.*); *see Kotis*, 183 N.C. App. at 623.

While Defendants call this interpretation "absurd," there is nothing absurd about protecting minority members of an LLC. "[M]inority members of an LLC have a much stronger position because, through the freedom of contract, they are able to obtain minority protections not available to shareholders of a closely-held corporation." *Gvest Real Est., LLC v. JS Real Est. Invs., LLC*, 388 N.C. 563, 573 (2025). Section 4.2's removal right is a sensible check on Managers (who are members of 1221, the majority-interest holder) installed for a ten-year term.

At the very least, Section 4.2 is ambiguous, which precludes dismissal given that all ambiguities must be resolved in Plaintiffs' favor on a motion to dismiss. *DFA Dairy Brands, LLC*

*v. Primus Builders, Inc.*, No. 5:21-CV-00026-KDB-DSC, 2021 WL 5826785, at *3 (W.D.N.C. Dec. 8, 2021) ("[I]f there is any factual dispute regarding how to properly interpret the contract, it is not appropriate for consideration under a 12(b)(6) challenge").

Next, Defendants continue to argue the merits with respect to Plaintiffs' requested declaration that Spice acquired the Baptiste and Akhenthians interests when its funds were used to repurchase them. (Doc. 22, pp. 15-16). Again, Defendants do not dispute that this is a live controversy. Instead, they debate the proper remedy, noting that misuse of company funds "may support an accounting, equitable lien, or constructive trust for the company's benefit." (*Id.*) That is a dispute about the remedy, not about whether a claim exists. Plaintiffs allege that 1221 used Spice's money to repurchase the interests, and they seek an accounting and disgorgement. (VAC ¶¶ 53, 101–102 & Prayer ¶¶ 8, 15). If Spice paid, Spice is entitled at least to equitable relief in the interests or their value. The form of that relief, including any proportionate adjustment, can be decided later. *See* Fed. R. Civ. P. 54(c) (final judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"). The Court should therefore deny Defendants' Motion on this ground.

### F. The Second Derivative Claim Establishes that the Atakoras Owed Spice Fiduciary Duties and Breached Them.

Defendants dedicate only four sentences to challenging Plaintiffs' breach of fiduciary duty claim. (Doc. 22, p.16). That allocation of resources is telling.

"A claim for breach of fiduciary duty has three elements: (1) existence of a fiduciary duty; (2) breach of that duty; and (3) damages resulting from the breach." *Leonard v. Ast*, No. 21 CVS 3913, 2022 WL 2726598, at *4 (N.C. Super. July 13, 2022). Plaintiffs allege all three.

As Managers, the Atakoras owed Spice fiduciary duties. N.C. Gen. Stat. § 57D-3-21(b); Doc. 17-1, § 4.7 (managers must act "in good faith, in a manner they reasonably believe to be in

or not to be opposed to the best interests of the Company"). The VAC also contains detailed allegations about the ways in which the Atakoras breached their fiduciary duties as Managers. (VAC ¶¶ 105, 53, 58, 85). Finally, the VAC contends that the Atakoras' breach of their fiduciary duties damaged Spice, which is self-evident. Even in this lawsuit, the Atakoras—who claim to be Spice's Managers and therefore still owe Spice fiduciary duties—contend on behalf of and in Spice's name that Spice's own trade name is too weak to protect so that the Atakoras may continue to operate a different restaurant. Put another way, the Atakoras' litigation conduct provides further evidence of the injury they are causing Spice.

The Atakoras also try to use Article 7 of the Operating Agreement as a shield. (Doc. 22, p.16.) They are not equipped to wield it. Article 7 applies only to Members—not Managers. (Doc. 17-1, Art. 7). And the Atakoras were Managers rather than Members when they breached their fiduciary duties.[6]

Nor does Defendants' attack on alleged post-removal conduct hold water when they actively dispute their removal.

As a result, the Court should deny Defendants' Motion as to this claim.

### G. The Ninth and Tenth Derivative Claims for Conversion and Civil Embezzlement State a Claim.

Defendants argue that these two claims fail because Plaintiffs "fail to identify the funds allegedly converted or allege facts establishing fraudulent or knowing and willful misappropriation." (Doc. 22, p. 17).

To the contrary, Plaintiffs allege that the Atakoras "converted the funds in Spice's bank

[6] Even if they could raise Article 7 as a shield, it would not defeat the claim. Article 7 merely allows a Member to "engage in or possess an interest in other business ventures," but it certainly does not allow the unlawful conduct described throughout the VAC. (*Id.*)

account for 1221 Hospitality's use, including to repurchase 1221 Hospitality's membership interest from Baptiste Consulting LLC and/or Akhenthians Investments LLC." (VAC ¶¶ 165, 171). Plaintiffs also identify specific transactions known to them. (*Id.* ¶¶ 51-53). These allegations satisfy the two elements of a conversion claim: "ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012). There is no special or heightened pleading requirement to "identify the funds allegedly converted."

To state a claim for civil embezzlement, Plaintiffs must allege that (1) the defendant was a fiduciary, officer, or agent of an entity, (2) such person embezzled or fraudulently or knowingly and willfully misapplied or converted to his own use **or** secreted with the intent to embezzle or fraudulently or knowingly and willfully misapply or convert to his own use, and (3) any money that came into his possession by virtue of that position. N.C. Gen. Stat. §§ 14-90, 1-538.2. Plaintiffs alleged that. (VAC ¶¶ 170-72) (alleging that the Atakoras were Spice's managers, controlled Spice's funds by virtue of those positions, and fraudulently, or knowingly and willfully, misapplied the funds to their own use); *see also* Fed. R. Civ. P. 9(b) (knowledge and intent "may be alleged generally").

Because the Atakoras knowingly and willfully (if not fraudulently) misapplied Spice's money into 1221's repurchases of membership interests, which was to their benefit as the members of 1221, Plaintiffs claims for conversion and civil embezzlement should survive.

### H. The Eleventh Derivative Claim for Civil Conspiracy Survives.

"The elements of a civil conspiracy are: (1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy. A 'conspiracy' is an agreement between two or more parties to carry out the conduct. Direct evidence of a conspiracy agreement is not necessary and often does not exist." *Crutchfield,*

*v. Bissette*, No. COA25-871, 2026 WL 3548224, at *7 (N.C. Ct. App. Nov. 18, 2026). "[I]t is difficult to dismiss a conspiracy claim summarily because the elements of a conspiracy claim are broadly stated." *Kelly v. Nolan*, 2022 NCBC 37, ¶ 65 (N.C. Super. Ct. July 19, 2022).

Plaintiffs alleged underlying torts to support a civil conspiracy claim, along with an agreement among 1221 and the Atakoras to commit them, which damaged Spice. (VAC ¶¶ 173–177). While Defendants argue that "Plaintiffs identify no facts supporting an agreement or concerted action" (Doc. 22, p.17), the entire VAC underscores a conspiracy between 1221 and the Atakoras to engage in the identified unlawful conduct. Nor does the wrongful conduct in furtherance of the conspiracy have to be distinct from the other claims.

Defendants also invoke intracorporate immunity. (*Id.* p.18.) That doctrine does not apply "where a co-conspirator possesses a personal stake independent of his relationship to the corporation." *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 353 (4th Cir. 2013) (quotation marks and citations omitted). The doctrine is inapplicable because the Atakoras were purporting to act as Spice's Managers and fiduciaries at all relevant times, and they were not exclusively 1221's agents in that capacity. Plaintiffs also allege that the Atakoras have a personal stake, having been paid from Spice's funds. (VAC ¶¶ 58, 110). Thus, the Court should deny the Motion on this claim.

### I. The Broad Scope of the Derivative Demands Encompass the Derivative Claims.

Plaintiffs issued three derivative demands spanning ten single-spaced pages, and alleging a plethora of misconduct, including (1) "flagrant disregard of the Operating Agreement and North Carolina law to convert Spice's funds for 1221 Hospitality's benefit" with respect to the use of Spice's funds to repurchase membership interests for 1221 (Doc. 17-3, p. 2); (2) failure to "maintain Spice's books and records and make them available for inspection" and refusal to

provide requested financial information (*id.*); (3) breach of fiduciary duty due to causing Spice "to expend funds for the sole benefit of 1221 Hospitality, to the detriment of" Spice and its other Members (Doc. 17-6, p.1); (4) conversion due to "exercising unauthorized dominion and control over" Spice's "funds by using them to benefit 1221" (*id.*); (5) demanding "corrective action to confirm that the Atakoras have been removed as Managers" and to "appoint new Managers" (*id.* p. 2); and (6) "misappropriation of Spice's trade secrets, confidential business information, and intellectual property" in connection with Spice Atlanta (Doc. 17-8). The second demand also identified that the "factual basis for this derivative demand is identified in . . . the Complaint filed in the pending litigation captioned *3 Ventures, LLC et al. v. Nana Atakora et al.*, Mecklenburg County Superior Court Case No. 25CV063911-590,"[7] which alleged that: (1) by "continuing to use" Spice's "funds without authorization" since their removal as managers, "including paying themselves salaries, the Atakoras have misappropriated" Spice's "funds and continue to do so"; and (2) the Atakoras and 1221 "mismanage[ed]" and "misappropriate[ed] the funds of Spice" for "the benefit of 1221" alone. The demand for inspection also identified the purpose of the inspection was to "[d]etermine the extent to which" Spice's "funds may have been misappropriated or misused." (Doc. 17-4, p.2).

All that, and yet Defendants argue that the demands "do not fairly encompass" claims for (1) misappropriation of Spice's assets outside of the repurchase of membership interests, (2) other unauthorized use of Spice's funds; or (3) payment of salaries after removal as managers. (Doc. 22, 19). But the demand need not constitute a ready-to-file complaint.[8] Instead, the demand "must be

---

[7] Because the challenge to the scope of the derivative demand goes to subject matter jurisdiction rather than Rule 12(b)(6), Plaintiffs request that the Court take judicial notice of the contents of the prior state court Complaint.

[8] Nor can Plaintiffs identify the full extent of Defendants' financial wrongdoing prior to discovery when Defendants refuse to provide the necessary information to evaluate Spice's financial status.

made with sufficient clarity and particularity to permit the corporation . . . to assess its rights and obligations and determine what action is in the best interest of the company." *Zoutewelle v. Mathis*, No. 17CVS20422, 2018 WL 4698735, at *6 (N.C. Super. Sept. 13, 2018) (quotation marks and citation omitted). Plaintiffs' demands satisfied that standard here.

**J. The Scope of Plaintiffs' First Individual Claim for Inspection is Appropriate.**

Consistent with steadfast refusals to provide requested financial documents, Defendants seek to narrow rather than dismiss the inspection claim against Spice. (Doc. 22, p.20).

Under N.C. Gen. Stat. § 57D-3-04(a)(5), a member may obtain "[i]nformation from which the status of the business and the financial condition of the LLC may be ascertained." The Operating Agreement also requires that Spice's books and records "contain true and full information regarding the status of the business and the financial condition of the Company," which they "shall make" available to any Member upon reasonable notice. which "shall include" eight enumerated categories, the last of which is open-ended. (Doc. 17-1, § 4.7.3).

Yet Defendants seemingly dispute Plaintiffs' request for bank statements, general ledgers, compensation records, membership-transfer documents, and historical budgets. (Doc. 22, p.20). Those are the precise type of records that would allow Plaintiffs to ascertain the status and financial condition of the business. Defendants even acknowledge that "transaction-level records" are not categorically excluded. (*Id.*) The need for transaction-level information is apparent from the VAC. (VAC ¶¶ 51–53, 58.) Plaintiffs' demand for inspection stated its purposes to evaluate Spice's financial condition, to determine the extent to which its funds were misused, and to assess transactions between Spice and its Managers, Members, and their affiliates. (Doc. 17-4). Due to the Atakoras' conflict of interest, summary financial statements prepared under their direction do not suffice and Plaintiffs need access to the underlying data to verify the accuracy of any financial statements.

Because it is premature at this juncture to determine what information is necessary to ascertain the financial condition of Spice, the Court should deny Defendants' request to narrow the claim.

### K. 1221 Breached the Operating Agreement in Connection with Adding Members and Repurchasing Their Interests, which Supports the Second Individual Claim for Breach of the Operating Agreement.

A claim for breach of contract has two elements: a valid contract and its breach. "[W]here the complaint alleges each of these elements, it is error to dismiss a breach of contract claim under Rule 12(b)(6)." *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 37 (2018) (quotation marks and citation omitted). The Operating Agreement is a valid contract, and Plaintiffs allege 1221 breached it. (VAC ¶¶ 42–47, 194-95). Thus, the claim should proceed. Defendants, however, urge the Court to decide the merits right now. (Doc. 22, p.21).

The Operating Agreement prohibits voluntary transfers of membership interests absent written notice to the Members, consent of the "remaining" Members holding a majority of membership interest, and the expiration of a 30-day right of first refusal period, none of which happened here. (VAC ¶¶ 44-49; Doc. 17-1, §§ 9.2, 9.4, 10.3). Defendants do not focus on this.

Instead, Defendants argue that 1221 did not breach the Operating Agreement when it used Spice's funds to repurchase the Baptiste and Akhenthians interests without notice to Plaintiffs. This argument fails. Defendants claim that 1221 had no obligation as an existing member bound by the terms of the Operating Agreement, and under the control of Spice's Managers, to comply with the Operating Agreement's transfer provisions. (Doc. 22, p.21). Through its repurchase, 1221 also effectuated the withdrawal of Baptiste and Akhnethians, which is not allowed absent "unanimous approval of all other Members." (Doc. 17-1, § 9.3).

Again, Defendants challenge the merits rather than the adequacy of the pleadings. Viewing the allegations and resolving all ambiguities in the light most favorable to Plaintiffs, they have

satisfied the low threshold of alleging a breach of contract.

### L. The Third Individual Claim Survives Because 1221 Owed and Breached its Fiduciary Duties to Plaintiffs as a Controlling Majority Member.

Defendants acknowledge that "a controlling majority Member may owe fiduciary duties to minority Members under certain circumstances." (Doc. 22, p.22). The North Carolina Supreme Court identified such circumstances as including when "a singular majority member is able to exercise sole control under the terms of the LLC's operating agreement." *Gvest*, 388 N.C. at 573. And it did not foreclose the existence of a fiduciary duty for a majority member who "control[s] the appointment of managers in a manager-managed LLC." *Id.* at 575; VAC ¶¶ 199-202.

Here, Defendants argue that 1221, as the holder of an 88% membership interest, controls appointment of managers in Spice. They also argue that the Atakoras, who are two of 1221's three members, with Nana as its sole manager, are the current Managers. 1221 maintains that its interest gives it the unilateral power to keep them in office over the minority's objection, and through them it has exercised "complete and exclusive control over Spice's operations, finances, records, meetings, distributions, and business decisions." (VAC ¶¶ 199–203). The Court of Appeals has held that a fiduciary-duty claim against a majority owner and managing member who "essentially ran the business," "controlled the finances," and failed to disclose the company's financial condition to a minority member was properly submitted to the jury. *Bickley v. Fordin*, 258 N.C. App. 1, 8 (2018). This case should be no different. Plaintiffs have sufficiently alleged that 1221 owes them a fiduciary duty as the controlling majority member.

Defendants also claim that any injury is derivative rather than direct. But Plaintiffs have alleged that 1221's breach of fiduciary duties has "depriv[ed] them of their right to participate in the governance of Spice, . . . and the ability to exercise their rights under the Operating Agreement." (VAC ¶ 205). Moreover, "potential liability for nominal damages is sufficient to

establish the validity of claims for breach of fiduciary duty. *Chisum v. Campagna*, 376 N.C. 680, 705 (2021).

Thus, the Court should allow the Third Individual Claim to proceed.

### M. The Fourth Individual Claim Sufficiently Alleges that Nana Atakora Breached the MPAs.

Again, when the complaint alleges a valid contract and its breach, it is error to dismiss a breach of contract claim under Rule 12(b)(6). *Cordaro*, 260 N.C. App. at 37. Plaintiffs allege that the MPAs are valid contracts and that Nana Atakora breached them. (VAC ¶¶ 211–214).

Section 1.3 of the MPAs prohibits payments to the Atakoras or related parties "as an employee or contractor of the Company" without Plaintiffs' prior written approval. (Doc. 17-2, § 1.3). Plaintiffs alleges such payments without that approval. (VAC ¶¶ 58, 212–214). As a result, Defendants turn to challenging Plaintiffs' damages theory. But Plaintiffs need not even allege damages to state a claim for breach of contract under North Carolina law. In any event, the breach injured at the very least Plaintiffs' bargained-for right to approve insider compensation, and the quantum of damages is not a requirement at this stage.

Defendants also argue that the alleged breach of § 3.1(b) "warranted title only to" membership interests and did not include any intellectual property. (Doc. 22, p.22). Section 3.1(b) warranted "good and marketable title to the Interest" and "full legal right to convey to Purchaser good and marketable title to the Interest." (Doc. 17-2, § 3.1(b)). At the time of the MPAs, Nana Atakora owned 100% of the membership interest in Spice, and Section 1.4 of the MfPAs identified his "right, title, and interest in and to the Interest," as including "rights and obligations associated with the Company's assets including, but not limited to, all of the Company's property, . . . goodwill, intellectual property, and the 'Spice Tapas' brand." (*Id.* § 1.4). If Nana Atakora did not own any of those delineated assets, then he breached § 3.1(b). For now, Plaintiffs have alleged a

breach of contract. Questions of fact regarding liability are for a later day.

The Court should therefore deny the Motion as to the Fourth Individual Claim.

**CONCLUSION**

For these reasons, the Court should deny Defendants' Motion to Dismiss.[9]

This the 20th day of November 2026.

**WOMBLE BOND DICKINSON (US) LLP**

/s/ Patrick Grayson Spaugh
Patrick Grayson Spaugh (N.C. Bar No. 49532)
Philip Mayer (N.C. Bar No. 52288)
301 South College Street, Suite 3500
Charlotte, North Carolina 28202-6037
Telephone: (704) 331-4996
Facsimile: (704) 338-7854
Email: Patrick.Spaugh@wbd-us.com

***Counsel for Plaintiffs 3 Ventures, LLC and MJT Ventures LLC***

[9] To the extent that the Court grants any portion of the Motion, Plaintiffs respectfully request that such dismissal be without prejudice so that Plaintiffs may potentially seek leave to amend.